[No. 29098. Department One. August 27, 1943.]

ETHEL SUMNER, *Petitioner*, v. THE SUPERIOR COURT FOR CLALLAM COUNTY, *Ralph Smythe, Judge, Respondent.*[1]

*John M. Wilson,* for petitioner.

*Max Church* and *D. E. Harper,* for respondent.

[1]Reported in 140 P. (2d) 784.

JEFFERS, J.—On May 19, 1943, Ethel Sumner, mother of Virginia and Patricia Sumner, minors, filed in this court her affidavit for a writ of certiorari to review an order of the juvenile court for Clallam county, made and entered on May 7, 1943, wherein the court adjudged Patricia Sumner to be a ward of the court as a dependent child, and ordered her committed to the Martha Washington school at Seattle.

Upon the filing of the affidavit, the chief justice, on May 19th, caused a writ to be issued, directed to the juvenile court for Clallam county, directing it to certify to this court a complete and full transcript of the record and proceedings had before it in the matter. The writ provided that a copy thereof be served upon the court at least ten days before June 25, 1943, the date fixed in the writ for the hearing. The record was duly certified to this court and is now before us, and the matter will be considered on the merits.

Mrs. Sumner will hereinafter be referred to as petitioner.

The question to be determined, as stated by petitioner, is whether or not the juvenile court was acting within its discretion in depriving petitioner of the custody of her daughter Patricia Sumner, who is between sixteen and seventeen years of age, on the record and proof produced in support of the complaint filed herein charging Patricia with being a dependent child.

While reference will hereinafter be made to Virginia Sumner, no complaint is made of the action of the court in regard to her.

In order to arrive at a solution of the question presented, it is necessary for us to go back to February 18, 1943, when a juvenile complaint was filed, asking that Virginia and Patricia Sumner, minor daughters of Ethel Sumner, be adjudged to be dependent children, in that they have no parent able or capable of exercising proper parental control over them. The statutes involved are Rem. Rev. Stat., § 1987-1 [P. C. § 593] et seq., particularly §§ 1987-1 and 1987-14. The complaint was filed by R. O. Ide, chief of police of Port Angeles, where Mrs. Sumner and her daughters have lived for many years.

Upon the filing of the complaint, a summons was issued and served upon petitioner, notifying her that a hearing would be held on February 20, 1943, at eleven a. m. The court minutes show that on the date mentioned, Mrs. Sumner and her two daughters appeared, together with D. E. Harper, deputy prosecuting attorney, Police Chief R. O. Ide, Policeman James R. Gallagher, and Carroll Marchand of the Clallam county welfare department. The minutes further show that the court informed Mrs. Sumner of her rights, and she was asked whether or not she was ready to proceed, to which she answered that she was. Statements were made by the two girls and the mother. The testimony of R. O. Ide and Mr. Gallagher was received, and the substance of this testimony appears in the minutes. At the conclusion of the hearing, the court continued the matter to Friday, February 26th, and instructed the mother and the two girls to come in at that time. It further appears from the minutes that on February 26th the girls appeared, as ordered by the court, at which time the matter was further continued until the girls' next quarterly report cards should be received.

On March 23, 1943, a new summons was issued, and on March 24th served on petitioner, requiring her to appear with her daughters on April 3, 1943. It also appears from the minutes that on March 31st, the court, at the request of John M. Wilson, attorney for petitioner, continued subject to call the hearing set for April 3rd. On April 12th, Mr. Harper, deputy prosecuting attorney, asked the court to set a date for the hearing and, it being agreeable to Mr. Wilson, the court set the matter for hearing on April 15, 1943, at ten a. m.

The cause came on for hearing in chambers, on April 15th, at which time Mrs. Sumner was present and represented by counsel. The two minors were present. Sixteen witnesses were called and testified, and we shall refer to their testimony as we proceed.

Much stress is placed by petitioner upon the fact that the testimony shows no act of immorality on the part of either

of the girls. The court's order was not based upon any act of immorality on the part of Patricia, or Virginia either; but, as we read the record, the order was based upon the theory that the home environment was such that, at least for the present, the home was not a proper place for a girl of Patricia's age; that this home condition was due either to the fact that Mrs. Sumner permitted her home to be frequented by boys who were not proper associates for her daughters and permitted certain boys to frequent her home even after she had been warned by the court regarding them, or that she was unable to control the situation.

In order that we may have some idea of the court's attitude in this matter, we quote from the minutes of the court on the April 15th meeting:

"Thereafter [after the hearing] the court finds that during the probationary period since the last hearing [the hearing of February 20th, during which time the girls had been left with their mother] the conditions in the home have not improved, but in fact have gotten worse. That the moral conditions in the home are very bad. The court indicated that it was his opinion in the first instance that the home was not a proper place for the children, but that an improvement was suggested and expected, and the mother has failed and neglected to make any adequate change."

The above statement indicates clearly that while the court, after the hearing of February 20th, was satisfied that the home conditions were not what they should be, the court left the girls with their mother, with the suggestion and in the hope that the mother would see that the conditions were improved. The court also undoubtedly had in mind Rem. Rev. Stat., § 1987-14, which provides in part as follows:

"No dependent or delinquent child as defined in this act shall be taken from the custody of its parent, parents or legal guardian, without the consent of such parent, parents or guardian, unless the court shall find such parent, parents or guardian is incapable or has failed or neglected to provide proper maintenance, training and education for said child; or unless said child has been tried on probation in

said custody, and has failed to reform, or unless the court shall find that the welfare of said child requires that his custody shall be taken from said parent or guardian."

We now desire to quote from the order committing Patricia Sumner to the Martha Washington school:

"The court after hearing all the evidence adduced and being fully advised in the premises, finds, that the said Patricia Sumner is a dependent child, that she was born on or about the 22nd day of October, 1926, and that the other material facts set forth in the complaint filed herein are true; and the court further finds that the said child being under the age of 17 years, is a dependent child for the reason that her mother has failed and neglected to provide proper maintenance, training, and education for the said child; that there is no parent or guardian able or capable of exercising proper parental control; that said child has been tried on probation in the custody of her mother and said conditions of dependency have continued during the two months period of probation, and the welfare of the said child requires that her custody be taken from the said mother."

May we say here, before we discuss the testimony offered in this case, that there is much in this record for which Mrs. Sumner should be commended, and we feel sure the court was influenced by these facts in allowing the girls to remain with their mother after the first hearing and after her attention had been called to the conditions which must be corrected.

Mrs. Sumner was raised in Port Angeles, and graduated from high school there. She thereafter married Mr. Sumner, with whom she lived about three years, and from whom she obtained a divorce. The two girls were born as the result of this marriage and, at the time of the divorce, were very small. Mrs. Sumner was left with the girls, and since that time has attempted to support and educate them by her own efforts. She has not asked for or received any outside help. She also supported and cared for her mother for some years, up until her mother's death. She worked for a while as a waitress, but for the past two years has worked for the Milwaukee railroad, where she is at the

present time employed. Her hours of employment are from eight-thirty a. m. to five or six o'clock p. m., and she sometimes stays later, when the work requires it. It may be admitted that the testimony shows Mrs. Sumner has a good reputation in the community in which she lives.

Mrs. Sumner testified that the girls had given her no trouble; that Virginia was a senior and Patricia a junior in high school.

Mr. Warren, principal of the high school, testified that Patricia had been absent from school one hundred twenty-five days between September 1, 1942, and April 15, 1943, and present thirteen and one-half days; that Virginia was present eighty-seven out of one hundred forty-three days of school. He further testified that on several occasions the mother called to say Virginia had a cold, or that Patty did not feel well; that on March 4th the school authorities telephoned to find out why the girls were not in school, and another girl, who had been dropped from school, answered the telephone. The girls were finally dropped from the school records, because of continued absences. The testimony of Mr. Warren and Miss Whitefield, a high school teacher, is to the effect that the girls while in school presented no disciplinary problem, nor had they caused any trouble while in school.

Mrs. Sumner testified she had attempted to get the girls to finish school, but had been unable to do so; that Virginia told her she had been out too much, and that she might as well stay out and get a job. Mrs. Sumner stated that part of Patricia's absence was due to an operation on her foot, and because of colds. Mrs. Sumner seemed to feel that she had done all she could to get the girls to continue their school work, but because of their age and the grades reached by them, she could not compel them to attend school if they did not want to go. It does not appear that either of the girls has been working.

We now come to the testimony relative to conditions in and about the home. This testimony is somewhat conflicting.

Mr. Ide, chief of police of Port Angeles, who filed the complaint, apparently based his actions in connection with this matter entirely upon reports made to him by his police officers, especially officers Pettingill and Gallagher.

Mr. Pettingill, who had been a city patrolman since October, 1942, testified in part as follows: That he had seen the girls on the street and in their home; that he was first directed to call at their home on March 6, 1943; that he had observed the girls prior to the date last mentioned, when on February 12, 1943, they communicated with some prisoners in the jail, without permission so to do; that the girls had drawn up a bench and were talking to the prisoners through the wicket.

The visit of this officer to the home on March 6th was occasioned by his picking up a thirteen year old boy (Bob Sandbakken) who was driving a car without lights. This boy told the officer there had been a party, and after it broke up some of them went to the Sumner home, and that the officer could see Bob Gassey there. The officer stated it was then about five-thirty a. m., and that he went up to the Sumner home, knocked on the door, and when one of the girls came to the door the officer asked if Bob Gassey was there; that Gassey came from the rear of the house; that while the witness was talking to Virginia, he observed the living room and saw another young man there, under the influence of liquor, and there was a pall of tobacco smoke and the smell of liquor in the room. Pettingill took Gassey to the police station. The witness did not see Mrs. Sumner there at that time.

Mrs. Sumner's version of the affair last above mentioned is substantially as follows: Virginia had gone to a party at the home of a family by the name of Rudolph. Patricia did not go, but later in the evening Mrs. Sumner and Patricia went after Virginia, and Bob Gassey brought them home. Mrs. Sumner testified that she thought the thirteen year old boy, Bob Sandbakken, was with the Gassey boy, and she did not question his being there; that they reached her home about two o'clock a. m. and stayed until about four-

thirty; that there was no drinking, and they just sat around and talked. Mrs. Sumner further admitted that at about four-thirty the Sandbakken boy was sent out for cigarettes, and it was apparently while on this errand that he was picked up by the police.

Robert Sandbakken testified he was thirteen years old and had been picked up at five o'clock in the morning while driving a car. He further testified he was at the Rudolph party and afterwards went to the Sumner home. The following is a part of the examination of this boy:

"Q. Where was Mrs. Sumner? [This was after they reached the Sumner home.] A. What? Q. Was she there too? A. Yes. Q. Did she go to bed? A. Yes. Q. Were you drinking? A. I had half a glass. . . . Q. They were sitting around there drinking beer until morning until you went down town? A. We didn't drink much just a little bit about a glass. Q. Who drank just a glass? A. All of us."

After a colloquy between the court and counsel, the following questions were asked:

"Q. It is true that they sat around there until you went down town drinking beer? A. Yes. . . . Q. You won't undertake to say how much? A. No. Q. How much was there there? A. Well there was two quarts when we landed there I think. Q. Did you see a case of beer? A. Not at Sumner's. Q. You had a case at the other place? A. Yes."

This boy also testified he took Bob Gassey's car to go after the cigarettes. He had apparently testified on the former hearing held February 20th.

Officer Pettingill further testified that on a good many nights while on patrol he had seen young boys coming from the direction of the Sumner home early in the morning; that about March 15th he saw four young men leave the Sumner residence, and that all of them were very drunk; that the boys he had seen hanging around and leaving the Sumner home were the type who were in trouble with the police. The officer then named four boys he had seen in and leaving the Sumner home, and stated that two of these boys had police records and another one had been up for investigation. Two of them, Jack Manier and Leonard

Magrew, had given the police considerable trouble, according to this officer. The Magrew boy was a juvenile offender, and had been for some time.

At this point, an objection was made by counsel for petitioner to a statement made by the court relative to the Magrew boy, after which the court stated:

"The motion will be denied. The minutes of the court will show that he [Magrew] was involved in this before and that he was a juvenile offender, and that the mother [Mrs. Sumner] and the children were informed of his delinquency at the previous hearing. Certainly the court can take judicial notice of a situation such as this, after having informed this mother and these girls of the kind of a boy this was."

Officer Pettingill testified that on the early morning visit of March 6th, both the girls were there, but he did not notice anything wrong with them; that he had had no complaints about the girls.

Mrs. Sumner testified she did not invite these boys to her home; that the Magrew boy would just drop in to visit, and sometimes he would bring with him a friend named Jack, who she thought was sixteen or seventeen years old; that the boys drink some, but they never come to her house drunk; that on one occasion they brought a couple of bottles of beer. She further testified that her girls drink a little beer, but not much; that sometimes on Friday or Saturday nights they had a few people in and would have a few drinks; that she thought it was better for them to have a glass of beer at home than outside some place. Mrs. Sumner denied that there were any all-night parties at her home.

Officer Gallagher testified that on the night of February 10th, he went to the Sumner home, looking for a sailor named Jack Manier, who had escaped from the officers; that he knocked but no one came to the door, and as it was open, he went in; that this was about nine-thirty in the evening; that as he walked in, Virginia came to meet him; that there were no lights on, and he turned his flashlight on a young sailor named Magrew, who was sitting on the bed in the bedroom; that he went through the house, but saw no one

there except Virginia and this sailor; that he saw a lot of beer bottles in the living room. This officer further testified that he had noticed young fellows going in and out of this home at all times of night, up until the time he went home at one a. m. He had noticed this condition especially the last three or four months. No complaint had been made to him about the girls.

Mrs. Sumner testified that on the evening of Mr. Gallagher's visit she was at home, but had gone out to get some wood; that when she came in the lights were all on, and she was gone only five or ten minutes. She further testified that after the officer left, Jack Manier, for whom the officer was looking, came out from under the bed. She admitted the police had been to her home three or four times after boys or looking for boys.

There was testimony by the officer that they saw lights on in this home all times of night. Mrs. Sumner stated that they had had prowlers around, and after that she left the lights on in the house.

John Kruth, who lives next door to Mrs. Sumner, testified that they had all kinds of night parties at the Sumner home; that the noise kept him awake; that when he worked nights, he had observed a party there almost every night, and the parties lasted until four or five o'clock in the morning; that he had seen drunks around there and that about every morning he picked up beer and whiskey bottles on the sidewalk next to the Sumner home, and even over on his lot. This witness had never been in the Sumner home, and did not know Mrs. Sumner or the girls except by sight.

Mrs. Kruth testified to about the same condition around the Sumner home as her husband. She did not know Mrs. Sumner or the girls.

Considerable criticism is directed to the testimony of Mr. Kruth, but there is nothing in the record to indicate he had any reason for telling other than the truth. The same may be said of the officers.

Miss Minnie Crossley, called by petitioner, testified she had known Mrs. Sumner for many years, and the girls since

they were babies; that the girls were obedient and kind to their mother, and in her opinion Mrs. Sumner had done all any mother could do to properly raise her girls. She further testified that Mrs. Sumner's reputation for morality and honesty was good; that she had never seen any parties at the Sumner home. She did not know how much the girls had been out of school the past year or why they were out of school.

Mrs. Glendora Cargo, whose daughter is a friend of Virginia's, was called by petitioner, and testified that her husband was not living; that her daughter was working and not in school; that Virginia had been in her home quite often, but Patricia had never been there. She further stated that Virginia had always been ladylike when at her home, and she considered her a suitable companion for her daughter; that she had never heard anyone say anything about Mrs. Sumner's reputation.

Mrs. Elizabeth McElravy, called by petitioner, testified that she had known the girls since they were babies, and had been in the home many times. She stated that Mrs. Sumner was a good mother, and that her reputation was good. However, it appears that the witness had been in the Sumner home only two or three times the past year. She had seen no drinking in the home.

Miss Franc Madison, who also lives next door to Mrs. Sumner, was called by petitioner, and stated that she had noticed nothing unusual going on around the Sumner home; that she had seen lots of chums of the girls there. She admitted the Sumners had a good many night parties, but she did not know how long they lasted as she went to bed about nine-thirty; and as she slept in that part of her home away from the Sumner house, and was a heavy sleeper, she did not hear anything after she went to bed; that the boys and girls she had seen going to the Sumner home were about the same age as the Sumner girls. She further testified she had seen no soldiers there, but on one occasion had seen four or five sailors there; that she had seen a lot of beer bottles around on the parking strip and on the side-

walk; that she had never seen Mrs. Sumner do anything she could call wrong, and she had never seen the girls drunk or drinking any liquor. Miss Madison was asked the following question:

"Q. Do you know anything wrong about Virginia? That is about her conduct and attitude toward life and her habits? A. Well I know that she has kind of a little wild ideas. I have done a lot of talking to her, there is a lot of good in Virginia if it could be brought out."

This witness testified that she had been in the Sumner home only once or twice, and that was within the last month.

F. R. Smith, local agent for the Milwaukee, testified that Mrs. Sumner had worked in his office for two years, and had missed only about a half day during that time; that her work was satisfactory, and that he considered her very efficient. He further testified that Patricia had been in his home once or twice a week, and was intimate with his daughter, who was sixteen years old; that he considered Patricia a satisfactory companion for his daughter.

It is apparent that there is very little in the record relative to Patricia, other than her school record and what may be gleaned from general statements.

We fully appreciate it is a serious matter to take a minor daughter away from her mother. The courts have always so recognized, and have been slow to place such a minor in the custody of someone other than the natural mother, unless the courts were convinced the welfare of the child demanded such action. We are satisfied that in this case the court, after two hearings, and after the mother had been given a chance to correct the home conditions, was convinced that the welfare of Patricia, at least for the present and until these conditions have changed, requires that she be placed in a different environment. It should be kept in mind that in this case the court not only saw the mother and the girls at the last hearing, but the court had had them before it at a previous hearing, and had given

the mother every opportunity to correct certain conditions, especially in regard to some of the girls' associates.

It should also be remembered that Port Angeles is not a large city; and undoubtedly some, if not all, of the parties to this proceeding are known to the court. While we do not intend to intimate that the court did in this case, or should in any juvenile hearing, reach its conclusion upon facts not appearing in the record, yet, particularly in a case of this type and in a locality such as Port Angeles, it is possible and probable that the court better understands the conditions and the necessity for its order than we possibly can from a reading of the record. In other words, it is the type of case where this court should hesitate to reverse the trial court upon a purely factual situation. Surely one of the purposes of the juvenile act is, where possible, to correct conditions which will probably result in a minor's becoming a delinquent, before the minor has actually committed some act bringing him or her within that classification.

Reference is made by petitioner in her brief to the fact that these are difficult times for young people; that boys seventeen and eighteen years of age are entering the service and suddenly find they have more freedom than ever before, and that unfortunately they are not always able to use this time wisely. We fully recognize this condition, and we are convinced that such condition is an additional reason for a mother's taking unusual precautions to safeguard girls of tender years from contacts and associations inimical to the welfare of such child, and possibly to others in the same community.

We have given this case serious thought, but after a consideration of the record, we are not prepared to say the court abused the discretion vested in it, in taking Patricia from her mother and placing her in the Martha Washington school.

The order of the court is affirmed.

GRADY, STEINERT, MILLARD, and MALLERY, JJ., concur.